Henry Nelson v. The State.

No. 3004. Decided May 17, 1905.

**1.—Murder in Second Degree—Conspiracy—Charge of Court.**

Where the evidence tended to show a conspiracy on the part of the defendant and his companions, evidence of the acts or declarations of co-conspirators in furtheranrce of the common design made or done subsequent to the formation of the conspiracy were properly admitted in evidence, but the court should have instructed the jury with reference to how they should consider said acts and declarations in the event the conspiracy was established, and to disregard them if it was not established. Following Chapman v. State, 45 Texas Crim. Rep., 479; 8 Texas Ct. Rep., 392.

**2.—Same—Acts and Declarations of Co-Conspirators—Evidence.**

All testimony which was in furtherance of the conspiracy in a case of homicide, as to acts and declarations of co-conspirators done and made in the absence of defendant are admissible in evidence.

**3.—Same—Manslaughter—Insult to Female Relatives—Charge of Court.**

Where the evidence showed on the trial of appellant that the husband of the deceased uttered scandalous remarks concerning his nieces, which remarks were communicated to appellant, and that thereupon he and his companions sought a meeting of deceased's husband and in attempting to slay him, killed his wife, the court should have charged on manslaughter and it was immaterial whether appellant conspired with others to go with him on that occasion; if he was laboring under excitement on account of said remarks and was incapable of cool reflection; or if the deceased interfered and assisted her husband and they slew her, it would be manslaughter under the circumstances.

**4.—Same—Self-Defense—Charge of Court—Law Must Apply to the Facts.**

In a prosecution for murder where there was evidence that appellant and his companions went to the husband of deceased for an explanation of certain slanderous remarks he made concerning appellant's nieces, and without hostile demonstrations were attacked by said husband in which attack his wife, the deceased, joined and fired at the parties and was shot and killed by them, the court should have accurately applied the law of self-defense to this phase of the case, as applicable in repelling such attack of the wife as well as that of the husband.

Appeal from the District Court of Trinity. Tried below before Hon. Gordon Boone.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

From the testimony of the defense it appears that the trouble originated through slanderous reports concerning female relatives of the defendant, circulated by the husband of the deceased, and which fact was communicated to defendant a few days before the homicide. The defendant testified that his brother first informed him of these reports and that a certain negro was circulating them: a few days before the homicide this negro was induced by defendant and his codefendants and others to retract these reports, but stated that Bob Alexander, the husband of the deceased was his informant, and someone in defendant's presence on that occasion stated that Alexander would also have to sign the retraction. The report not only involved the conduct of defendant's relatives but himself and his codefendant's as well. Defendant's father, on the Sunday evening previous to the killing on Monday morning following, met Bob Alexander and asked him with reference to these reports, and if the latter ever denied them that witness did not remember it; but Alexander remarked, "it was some damn lies" and finally told defendant's father, "you tell those boys to come and see me, we will settle this matter peaceably," and to come early Monday morning. Defendant's father communicated this conversation to defendant and some of his codefendants, but told his boys, including defendant, not to go to Alexander. It appears from the defendant's testimony that he started to make a professional call on Monday morning of the homicide, and as he got ready to leave his home some of his codefendants appeared and asked him if he intended to call on Alexander about these reports and he replied he might and rode away in the direction of Alexander's place, leaving his codefendants behind on foot and not knowing whether they intended to follow him, and with no understanding with them that they should do so. He decided to go by Alexander and talk to him about the matter and as he rode up and halloed, Mrs. Alexander, the deceased answered that her husband was at the lot and asked defendant to get down, which defendant declined saying he would ride around and meet Alexander; that as he met him, saying good morning to him, the latter did not speak but passed by defendant and motioned deceased to bring his gun; that deceased at once complied with this request and handed her husband his winchester, defendant saying that there was no use for his gun, that defendant simply came to talk to him about these reports; that Alexander cursed and abused the defendant throwing his gun down on him and told him that when defendant got away from there, he would be carried away, etc. Defendant started to ride away, but Alexander stepped in front of his horse saying, "don't you move, you damn son-of-a-bitch, if you do I will shoot you full of winchester holes"; calling to his wife that they would scorch defendant; that deceased stepped out in the yard and started towards defendant, when about that time defendant's companions and brothers came walking up; that Alexander then left defendant and turned towards them throwing his gun on them saying: "Every damn son-of-a-bitch of you throw up

your hands"; that defendant rode up towards a back gate and began to unfasten his jumper, when deceased said, "look at him!" and Alexander turned and looked at defendant, and then turned and fired at defendant's brother and companions; that defendant jumped off his horse, the horse running away and by the time defendant reached the ground, deceased shot at him, and her husband was shooting at the other boys, and defendant drew his pistol and began firing at Alexander, the latter returning the fire, shooting a hole through defendant's hat; that defendant got behind a wood pile, Alexander reloading his gun in the mean time, when he was shot by defendant's companions; that defendant then emptied his pistol shooting at Alexander, but that he at no time intended to fire at deceased; that she was killed accidentally and that he had no knowledge of it; that he had at no time entered into a conspiracy with anyone to kill either Alexander or his wife and that he had been acquitted of the charge of killing the husband, etc.   That defendant immediately sought medical aid for deceased, etc.

The State's testimony as to the circumstances of the killing did not materially differ from those detailed by the defendant, except that the two young daughters of Alexander did not testify to their mother shooting at defendant, and they did not hear their father curse or abuse or threaten him or see him fire a shot.   One of them testified that after the first shot she looked around and the smoke was in front of defendant, whom she had seen just before with a pistol; that then a number of shots followed, some of which resulted in her parent's death. This witness also testified that when she heard the first shot, her father had his gun on the rest of the boys and defendant was standing outside of the yard  *  *  *  when she heard the shot she turned and looked and the smoke was in front of defendant and her father turned and threw his gun on defendant, and that then she ran, etc.   There was also some testimony brought out on cross-examination that the deceased in her dying statement disclosed that she had fired one shot and that her husband fired from one to four shots.   There was also testimony that the evening prior to the homicide one or more of defendant's codefendants invited other parties to go back of a certain field and "settle that little trouble" and that they wanted to go Monday morning; that Bob Alexander lived back of this field, etc.   There was also testimony that defendant's codefendants were seen together on Monday morning shortly before the homicide, walking towards the Alexander place, etc.   The above statement with that in the opinion is a sufficient statement of the case.

*Kenly & Stevenson, Moore & Adams, Bean & Nelms* and *Adams & Adams,* for appellant.—Mercersmith v. State, 8 Texas Crim. App., 211; Bowers v. State, 24 id., 542; Phillips v. State, 26 id., 228; Henry v. State, 54 S. W. Rep., 593; Cook v. State, 27 Texas Crim. App., 198; Powers v. State, 61 S. W. Rep., 735.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at five years confinement in the penitentiary; hence this appeal.

As we read the evidence, three theories are presented. The State was authorized to insist on conviction for murder on the ground, that appellant and his codefendants entered into a conspiracy to kill Bob Alexander because of certain insults which said Alexander had uttered against certain female relatives of appellant, and that at the time of such killing they were cool and deliberate and not actuated by passion arising from said insults, and that in killing or attempting to kill said Bob Alexander they accidentally killed D. V. Alexander, his wife, or that D. V. Alexander was included within the scope of such conspiracy should she interfere, and in resisting their attempt they killed her. Or the State could insist on a conviction for manslaughter on the ground of insults to the female relatives of appellant and those with him, uttered by Bob Alexander, and which had been communicated to them, and that at the time of such killing they were excited by passion on account of such insults. On the other hand, if appellant and his confederates went to Bob Alexander's on a peaceful mission to have an explanation and statement in regard to said alleged insults to their female relatives, and when they went to Alexander's for said purpose, Alexander and his wife attacked them, then appellant had a perfect right of self-defense.

However, the court in his charge to the jury utterly ignored the doctrine of conspiracy, although he admitted evidence which could only have been authorized on the ground of conspiracy. The court also ignored manslaughter, as he failed to give any charge on that subject, although the evidence presented that issue and demanded a charge on that subject. With reference to the question of conspiracy, appellant requested a number of instructions presenting that phase of the case, and safeguarding his rights,—especially with reference to the declarations of other codefendants made in his absence. Now, with reference to a conspiracy we lay down this proposition: There is evidence in the record tending to show a conspiracy on the part of appellant and his companions to kill Bob Alexander. This conspiracy may be gathered from antecedent acts and conduct of appellant, in connection with his codefendants, both before and on the morning of the homicide. Where evidence has been admitted, as is the case here, tending to show a conspiracy, evidence of the acts or declarations of other co-conspirators with appellant, in furtherance of the common design, made or done subsequent to the formation of the conspiracy, are admissible in evidence against appellant. Such acts and conduct, as we understand here, were admitted in evidence. It was the duty of the court, however, to have instructed the jury with reference to how they were to consider such acts; that is, if they believed a conspiracy was established on

the part of appellant and those acting with him at the time of the homicide to kill Bob Alexander, because of insults uttered by him towards the female relatives of appellant, and that in pursuance of such conspiracy ·they went to the house of said Alexander for the purpose of killing him, and that they were not actuated by passion at the time, and before any attack on his part, they assaulted him and in endeavoring to kill him they accidentally slew his wife, or if they had determined beforehand that, if appellant's wife or any one else, interfered to prevent them from killing him, and that they intended to kill such person, and appellant's wife did interfere in the difficulty and they intentionally killed her, then they would be guilty of murder, either of the first or second degree, as the case might be. On the other hand, it was the duty of the court to have instructed the jury that, if they did not believe any conspiracy had been established between appellant and the others acting with him to kill Bob Alexander, on account of said alleged insults, they could not regard any acts or declarations made by others, in the absence of appellant, tending to show animus or any acts of preparation on their part.

In this connection we would observe that the case of Chapman v. State, 8 Texas Ct. Rep., 392, in its facts, as well as its legal propositions, is very much like the case at bar, and we can do no better than refer to said case, for the propositions arising in this case, in regard to the doctrine of conspiracy.

We would further remark that some evidence was objected to as to acts and declarations of others made in the absence of appellant, on the ground that no conspiracy was shown, and that such acts and declarations were not in· furtherance of any conspiracy. All of such testimony which was in furtherance of a conspiracy was admissible.

In regard to the failure of the court to charge on manslaughter, as we understand the evidence, so far as the State's case was concerned, this was the paramount issue. There, can be no question from this record that Bob Alexander uttered scandalous remarks attributed to him by the witnesses in regard to the female relatives (nieces) of appellant. There can be no question that these slanderous accusations were communicated to appellant prior to the homicide. We fail to recall any testimony which shows that he may have met with Bob Alexander between the communication of the ·slanderous remarks· to him and the homicide. Nor is it at all doubtful, that he went to see Bob Alexander, on the morning of the homicide on account of said slanderous remarks. According to the State's theory, he and his companions sought the meeting on a hostile mission. According to his own account he went there on a peaceful mission to have an explanation made to him by said Alexander in regard to said remarks. Now, whether he conspired with others to go with him, on that occasion or not, is immaterial. If he was laboring under excitement on account of said remarks, and was incapable of cool reflection, and when they reached the place, appellant and his companions in attempting to slay

Bob Alexander, although without any justification on their part, accidentally killed his wife, D. V. Alexander, then it could be no more than manslaughter on his part. Or if she interefered, and assisted her husband, and they slew her, it would be manslaughter as far as he was concerned. As stated before, it could only be murder in case he was not actuated by passion at the time. As heretofore stated, no charge was given on manslaughter whatever, and yet it occurs to us that this is the only evidence in the case on which the State ought really to ask for a conviction. Why the learned judge failed to give a charge on this subject we are at a loss to understand. On the other hand, while the court gave a charge on self-defense, we believe the court should have applied the law to the facts of this case more accurately than was done, and the jury should have been especially told, that appellant and those with him had the right to defend themselves not only against Bob Alexander but against any hostile act or demonstration of his wife, D. V. Alexander. There was evidence that she engaged in the difficulty, and fired at the parties. If appellant and those with him went there on a peaceful mission, or if after going to Alexander's they made no hostile act or demonstration against Bob Alexander or his wife, and Bob Alexander first attacked them, and his wife joined him in such attack, then they had a right to self-defense as well against her as against him, and the charge should have been so framed. As we read the charge they were not authorized to defend against an assault made by her, though the record shows evidence of such assault by her.

There are other assignments but, in the view we take of this case, it is not necessary to discuss them.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*