## NATHAN CHEATHAM v. THE STATE.

### No. 51.    Decided December 15, 1909.

**1.—Assault to Murder—Charge of Court—Self-Defense.**

Where, upon trial for assault with intent to murder, the State's testimony showed that the defendant waylaid the injured party and shot him, and that of the defense was that he acted in self-defense, the charge of the court which confused the right of perfect self-defense with the question of lying in wait was reversible error.

**2.—Same—Charge of Court—Insult to Female Relative.**

Upon trial for assault with intent to murder, where the evidence showed insulting conduct by the deceased towards a female relative of the defendant, a charge of the court which submitted this issue, and instructed the jury that de-

fendant had a right to arm himself and seek an explanation of the deceased, but which failed to instruct the jury of what offense defendant would be guilty in the event he killed the deceased, was reversible error.

**3.—Same—Charge of Court—Lying in Wait—Self-Defense.**

Upon trial for assault with intent to murder, where the evidence showed lying in wait and self-defense, it was error to charge the jury that defendant was deprived of his right of self-defense if he waylaid deceased, as this confused the two issues presented by the evidence.

Appeal from the District Court of Cass. Tried below before the Hon. P. A. Turner.

Appeal from a conviction of assault with intent to murder; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*O'Neal & Allday,* for appellant.—On question of court's charge of self-defense, etc.: Goodman v. State, 47 Texas Crim. Rep., 388, 83 S. W. Rep., 196; Fuller v. State, 95 S. W. Rep., 1039; Vann v. State, 45 Texas Crim. Rep., 434; Sprinkle v. State, 49 Texas Crim. Rep., 224, 91 S. W. Rep., 787; Winters v. State, 37 Texas Crim. Rep., 582; Morrison v. State, 37 Texas Crim. Rep., 601; Drake v. State, 45 Texas Crim. Rep., 273.

*F. J. McCord,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of assault to murder, and his punishment assessed at two years confinement in the penitentiary.

The following is the evidence as gleaned from the record before us: The trouble between the appellant and Will Heard, out of which this prosecution grew, occurred on Sunday, the 12th day of May, A. D. 1907. The parties involved are all negroes, Will Heard having married a half sister of appellant. On the day of the difficulty the parties had been to church, and Heard and his wife dined at appellant's. There had never been the least trouble between appellant and Will Heard up to this time, so far as the evidence shows. On this afternoon Amy Cheatham, a woman fifty-four years of age, and the mother of the appellant, while walking down a country road, looking for one of her children, met Will Heard, and he asked her if she were going to church that night, and she replied that she was not; that someone had been wrongfully accusing her of writing a letter to her sister, Lou Camp, who was the mother of the wife of Will Heard.

It seems that Della Heard, the wife of Will Heard, was an illegitimate child of Henry Cheatham and Lou Camp, and Henry Cheatham is the husband of Amy Cheatham, and the father of the appellant.

Heard accused Amy Cheatham of having written the letter, which

she positively denied, and after some quarrel between them, Heard called her a liar, and jumped from the horse he was riding, and told Amy Cheatham he would slap hell out of her, and he did slap her twice, and so severely that it caused her face to swell, the swelling remaining for some days. He also picked up a rock and threatened to strike her with it when Hattie Cheatham, the daughter of Amy Cheatham, appeared on the scene and requested Heard to desist from the abuse of her mother, and he threatened to slap Hattie, who was the daughter of Amy Cheatham and the sister of the appellant. When Heard threatened Hattie she immediately turned in the road and started for her brother, the appellant, to inform him of the conduct of Heard towards her mother and herself, and she did so inform him, finding him at his mother's house.

Heard denied that he struck Amy Cheatham, but he is contradicted by Hattie and Amy Cheatham, and by all other facts and circumstances leading up to the difficulty. Appellant testified that Hattie Cheatham told him, when she came after him, of the abuse of his mother by Heard. West Cheatham testified that appellant told him that Heard had struck his mother, and Lou Camp, a witness for the State and the mother-in-law of Heard, testified that after the appellant returned, just after he had shot Heard, he stated to her that he would kill any damn negro that hit his mother. Heard, Amy Cheatham, Hattie Cheatham and Carrie Camp all agree that just as soon as the same happened Heard turned immediately around in the road and rode in a fast gait for home, showing evidently that something had happened that caused him to hurry home. These witnesses were the only eyewitnesses that were present at the time of the trouble. When Hattie reached home she related to appellant the difficulty between her mother and Will Heard when she left her mother and Heard in the road, the latter immediately remounted his horse and started in a fast gait for his home. When Hattie informed appellant of the trouble between her mother and Heard, appellant picked up a single barrel shotgun, loaded with small shot, belonging to his father, Henry Cheatham, and started from home for Heard's house to ask him about his conduct towards his mother, and in the road he met his mother returning home crying. When he had reached the creek, about one-half mile from where he had started, he was overtaken by his brother, West Cheatham, who persuaded him to return home; that it was better to see Heard another day, and not at Heard's house. Appellant was prevailed on by West Cheatham to return home and not to seek Heard for any purpose, and in pursuance with West Cheatham's request that he would return home, they turned in the road and started home, and going in a direction away from the home of Heard, and while thus traveling Heard cut across and got in ahead of appellant, armed with a double barrel shotgun, and proceeded to make an attack upon the

appellant. When appellant discovered Heard he retreated, Heard following him, and when appellant had retreated about thirty yards he turned and fired on Heard, just as Heard was raising his gun to fire, striking Heard in the eye with one small shot, and two or three shots hitting him in the neck and body. Heard denied that he was the aggressor, but claimed that he was waylaid by appellant and shot from ambush, but all the facts and circumstances surrounding the case support strongly the theory of the appellant and contradict Heard. Heard testified that immediately on Hattie Cheatham's leaving him and Amy Cheatham in the road, he started for home on horseback, and made no halt or stop on the road; that Hattie had to go one-fourth mile before she reached the point where she found appellant, and that appellant came back the same road that Hattie had traveled going after him, traveling one-fourth mile before reaching the point where Amy and Heard had the trouble, and the point from which Heard had started home, making in all one-half mile that appellant and Hattie traveled before the appellant reached the point from which Heard started; and that appellant overtook him at the creek, one-half mile from where Heard started. When appellant came in sight, he put hickory to his horse, and ran his horse home, running the horse up to his gate and there hitching it; that he stayed there twenty minutes by the clock, and then took his gun and went out and unhitched his horse from the gate and went to his pasture, traveling the road that led to his pasture gate, and while taking the wire off of his pasture gate in the endeavor to open the same the appellant, who was concealed in the pasture, shot him. His wife, Della Heard, testified that when Heard came home before the shooting he did not bring the horse, but that he came on foot, and that she saw him coming up the road for one hundred yards before reaching his gate and on up to his house, and that he was afoot, and did not have his horse. Carrie Camp, witness for the State, testified that when Heard left with his gun he did not carry his horse with him, but left the same hitched to the fence at the house, and that after he had gone she unsaddled the horse and put the saddle in the barn and the horse in the stall, and that the horse was still in the lot when Heard returned, after being shot. Eubanks, the constable of the precinct where the shooting occurred, testified that on Monday following the Sunday of the difficulty he made an investigation as to the trouble, and went to the house of Heard and asked him for a statement of the difficulty. Heard stated to him that after he had the trouble with Amy Cheatham he went home and got his gun and went out to the front door of his house, climbed into the field, and traveled through the field down the fence row to where his fence reached the corner of the road; that he there climbed out of his field, crossed the road, and climbed into a field that was then being rented and cultivated by Henry Cheatham, the

father of the appellant, then went down the fence row of Henry Cheatham until he reached some bars in the Cheatham field; that he went out through the bars and into the road where he came upon appellant and West Cheatham; that when he came up on them West Cheatham tried to stop the trouble. Appellant proposed that they both lay their guns down and fight it out with their fists; that he told the appellant no, that they would shoot it out, and that while he was trying to get an opening to shoot, that appellant shot him. Eubanks further swears that there had been a rain the Saturday before the shooting and that it was easy to track anyone in the field, and that he did take Heard's track from his house, through his field, across the road, and through Cheatham's field just as Heard had told him he had traveled to the scene of the shooting, showing that Heard could not have carried his horse to the pasture and strongly corroborating the appellant that he was on his way home and cut off by Heard as he testified. W. H. Betts, who was justice of the peace of justice precinct No. 8, Cass County, Texas, when this difficulty occurred, in motion for a new trial, made affidavit that on the 17th day of May, a few days after the difficulty, he had a conversation with Will Heard, in which conversation Will Heard stated to him that on the day of the difficulty that he did slap Amy Cheatham's jaws, and that he then went immediately home for his gun to shoot it out with Nathan Cheatham; that he got his gun and returned and cut Nathan Cheatham off, on his return home accompanied by his brother, West Cheatham; that when he came in sight of Cheatham, Cheatham retreated, he pursuing him, and after Cheatham had retreated for some distance he turned on him, Heard, just as he was raising his gun to shoot Cheatham. He also stated to Betts that he traveled the route in cutting off Cheatham that he had stated to Eubanks. If the statement made either to Eubanks or Betts is true, then the statement made by West Cheatham and the appellant must be true, and Heard was the aggressor, and Cheatham had only fired after he had retreated some distance, and then in self-defense, and their statement must be true that appellant had abandoned all idea of going to Heard's house, and was on his return home when he was intercepted by Heard and forced into the fight. The evidence is thus stated in the brief of appellant.

1. On the law the court charged the jury as follows: "On the law of self-defense you are further instructed that if from the acts of the said Will Heard (if any) or from his words coupled with his acts (if any) and from all the evidence in this case there was created in the mind of the defendant a reasonable apprehension that he (the defendant) was in danger of losing his life or of suffering serious bodily harm at the hands of said Will Heard, then the defendant had the right to defend himself from such danger or apparent danger as it reasonably appeared to him at the time, viewed from

his standpoint. And a party so unlawfully attacked is not bound to retreat in order to avoid the necessity of killing his assailant. If you believe that the defendant committed the assault as a means of defense, believing at the time he did so (if he did do so) that he was in danger of losing his life or of serious bodily injury at the hands of said Will Heard then you will acquit the defendant, unless you further believe from the evidence beyond a reasonable doubt that the defendant lay in wait with intent to take the life of said Will Heard or to do him such serious bodily injury as might probably end in the death of said Will Heard, and if you so believe from the evidence beyond a reasonable doubt, then you are instructed that the defendant would not be permitted to justify on the ground of self-defense, even though he should thereafter have been compelled to act in his own self-defense; but if the evidence fails to satisfy you, beyond a reasonable doubt, that defendant did so lay in wait with intent to kill Will Heard or to do him such serious bodily injury as might end in his death, then his right of self-defense would not be forfeited, and he could stand his ground and defend himself by the use of such means of defense as the facts and circumstances indicated to be necessary to protect himself from danger or what reasonably appeared to him at the time to be danger. If you believe from the evidence that defendant was informed that Will Heard had uttered insulting words or had been guilty of insulting conduct towards his mother, then he would have the right to seek for Will Heard to see him and talk to him concerning the same with a view to ascertain the true facts concerning such insults, and with a view to settle it peaceably with him, and if he feared that Will Heard might attack him and kill him or inflict serious bodily injury upon him, then he would have the right to arm himself for the purpose of protecting himself against such feared attack of said Will Heard, and if you find he did so, then none of his rights of self-defense would be lost. But in this connection you are charged that defendant would not have the right to arm himself for the purpose of seeking and killing said Will Heard, or for the purpose of inflicting on him serious bodily harm." This charge is not the law. The fact that appellant waylaid the injured party per se would not forfeit his right of self-defense. The court in one portion of the charge indicates it would, and in another that it would not. If appellant waylaid the injured party and shot him when his mind was incapable of cool reflection, on first meeting, after being informed of the insult to his female relative, then in that event he would not be guilty of any higher grade of homicide, if death had ensued, than manslaughter; death not ensuing, he would be guilty of aggravated assault. The charge confuses the right of perfect self-defense with the suggestion of lying in wait. On the other hand, if appellant waylaid the injured party and shot him when his mind was capable of cool reflection, and

same was cool, then he would be guilty of assault with intent to murder.

The latter part of the court's charge is also objectionable wherein he tells the jury: "If you believe from the evidence that defendant was informed that Will Heard had uttered insulting words or had been guilty of insulting conduct towards his mother, then he would have the right to seek for Will Heard to see him and talk to him concerning the same with a view to ascertain the true facts concerning such insults, and with a view to settle it peaceably with him, and if he feared that Will Heard might attack him and kill him or inflict serious bodily injury upon him, then he would have the right to arm himself for the purpose of protecting himself against such feared attack of said Will Heard, and if you find he did so, then none of his rights of self-defense would be lost. But in this connection you are charged that defendant would not have the right to arm himself for the purpose of seeking and killing said Will Heard or for the purpose of inflicting on him serious bodily harm." The latter clause does not tell the jury what appellant would be guilty of, and, therefore, is clearly misleading. It depends altogether upon what frame of mind appellant sought the injured party for the purpose of killing him. Laboring under insults to his mother, if he killed him, under passion aroused from adequate cause, it would not be anything but manslaughter. If he was laboring under that degree of anger, rage, sudden resentment or terror, which rendered his mind incapable of cool reflection, and he killed him on first meeting, it would be manslaughter, but failing to kill him, it would be aggravated assault. The court, as suggested, tells the jury that he would have the right to arm himself and seek out the party, and if he did so, then none of his rights of self-defense would be lost. The court fails to inform the jury what rights he alludes to.

The court furthermore tells the jury that if defendant started out to find and kill Will Heard or to do him serious bodily injury as might probably end in his death, and that he lay in wait with intent to kill and that while lying in wait he shot Will Heard, that he could not avail himself of the right of self-defense, even though he shot Will Heard to save his own life. This charge was erroneous. Appellant might have been lying in wait to kill Will Heard, but it does not necessarily follow that if he was doing nothing at the time to execute his purpose, and Will Heard shot at him, he would have the imperfect right of self-defense.

For the errors pointed out, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*