## MATHEW DAVIS v. THE STATE.

### No. 2321.   Decided April 2, 1913.

**1.—Murder—Manslaughter—Insult to Female Relative.**

Where, upon trial of murder, the evidence raised the issue of murder in the second degree, and manslaughter on account of insulting language to defendant's wife, there was no error in the court submitting a charge on murder in the second degree and manslaughter.

**2.—Same—Evidence—Uncommunicated Insults.**

Where, upon trial of murder, there was evidence of communicated insults to a female relative, uncommunicated insults of the same character should have been admitted in evidence, to show the probable truth of the communicated insults. Following Hill v. State, 52 Texas Crim. Rep., 241, and other cases.

**3.—Same—Evidence—Res Gestae—Supporting Testimony.**

Where, upon trial of murder, there was an issue raised by the evidence as to whether deceased used insulting language towards the wife of defendant and whether she had communicated the same to the defendant, the court should have admitted in evidence testimony that a few minutes after the shooting and after deceased had been carried into the room, a conversation occurred between him and defendant's wife in which the deceased admitted that he had used the insulting language. Following Drake v. State, 29 Texas Crim. App., 265.

**4.—Same—Evidence—Supporting Testimony.**

Where State's witnesses contended that no insulting language was used by the deceased concerning defendant's wife, the court should have admitted testimony that the deceased on the day before the killing admitted that he had used such language.

**5.—Same—Evidence—Conclusions of Witness.**

Upon trial of murder, it was error to admit testimony as to witnesses' opinion that deceased was an inoffensive man and was murdered for nothing on earth; however, the bill of exceptions was defective. Following Drake v. State, 25 Texas Crim. App., 293, and other cases.

Appeal from the District Court of Hardin.   Tried below before the Hon. L. B. Hightower.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*V. A. Collins* and *John L. Little,* for appellant.—On the question that the court should only have charged on manslaughter: Harris v. State, 8 Texas Crim. App., 90; Neyland v. State, 13 id., 536.

On question of impeaching witness: Hyden v. State, 31 Texas Crim. Rep., 401; Williams v. State, 24 Texas Crim. App., 637.

On question of opinion of witness: Messer v. State, 63 S. W. Rep., 643.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at ten years confinement in the penitentiary.

The only cause for the killing grew out of insulting remarks made to defendant's wife on Saturday morning. These remarks were communicated to defendant by his wife that night after they retired. The evidence of the defendant and his wife shows that he was nervous and restless and slept but little, if any, during the night. The next morning early about sunrise he secured a pistol and went to see deceased with reference to the matter. Deceased and his wife had spent Saturday night at the residence of their father-in-law, C. C. Burnett. Defendant and the deceased married sisters. Not a great while before the homicide the home of deceased had burned and he and his wife were invited guests of appellant and his wife until they could build or secure them another home. Saturday morning the two sisters had some words. The deceased remarked to appellant if he would hold his wife he, deceased, would catch his wife and make them kiss and make up. The two men were friendly and there was no trouble between them about this matter. Deceased drank a cup of coffee and left the premises. The wife of deceased was on the gallery, and appellant's wife went out on the gallery and as deceased was leaving she remarked to him, "Bud (his name being Bud Patterson), you derned fool, come back and get your breakfast." He remarked to her: "You go back in the house and shut your God damn mouth and keep your damn mouth shut. I am getting damn tired of it, I don't want any more." He was then standing at the front gate of appellant's yard. This is the testimony of the wife of appellant. The wife of deceased, Mrs. Lethia Patterson, testifies this way about it: "When my husband started out at the gate she (appellant's wife) come on to the gallery and said, 'Bud, you derned crazy fool, come back and eat your breakfast.' But never said anything. She said, 'Bud, you God derned fool, come back here and eat your breakfast.' He just put his hand on the gate and said, 'Gertie, you go back into the house and attend to your own damn business and I will attend to mine.'" This is the testimony of the two eyewitnesses to what occurred in reference to insulting conduct at that time. The wife of appellant conveyed her version of it to appellant that night upon retiring. On Sunday morning about sunrise appellant went to the house of Mr. Burnett and found Mr. Burnett and the deceased and his (appellant's) wife on the front gallery of Burnett's residence, and asked the deceased to walk out, that he wanted to talk with him. They went off

something like fifty or sixty yards and engaged in a conversation. The witnesses did not hear all that was said between them. Mr. Burnett testified that the parties went something like sixty yards from where he was sitting on the gallery. It was about twenty yards from the gate to the front gallery. He places Mrs. Patterson, widow of the deceased, on the gallery at the time. He says he was noticing them when they come to a stop; could not hear anything that was said; nothing more than the voices; they were talking low. "I saw the movements they made; they stood five or six feet apart facing one another. They were talking in rather a low tone, I think; I could not understand anything they said. I saw Patterson make a start towards Davis pretty peart and he commenced jumping backwards and running backwards together, and Patterson followed him up some little distance; Davis was fumbling at his shirt bosom to get it open; finally he got the pistol out and threw it on him and he stopped; he stood there a second or two and looked at him and then made for the house. Patterson looked at him a second or two and turned right around towards the house. Patterson never stopped advancing on Davis until the pistol was jerked and throwed down on him. I saw the pistol when Patterson turned and started towards the house. I did not hear anything he said, couldn't hear, couldn't understand anything that was said at all. As to whether right at that time and just a moment before the shooting my daughter Mrs. Patterson holloed to me, 'Papa, Bud wants his gun,'—well, when he started to run back she said, 'Papa, Bud wants his gun,' but I couldn't hear anything that Bud said, but she said she heard him call for his gun and told me that, and I suppose he made that remark at that time; she said, 'Papa, Bud wants his gun.'"

Park testified that he was in Burnett's house and did not know when appellant came in the yard. "I was there when Bud Patterson was there because Bud stayed there all night, he and his wife. The first thing that attracted my attention was I heard Mrs. Patterson, Bud Patterson's wife, holloing and screaming and I heard old man Burnett say, 'You, Matthew, don't you do that.' I was in the house at the time and I stepped to the door. I saw Matthew throw the gun down on him and heard it fire. When the gun fired I judge Bud Patterson was about thirty steps from the house. Matthew Davis shot Bud Patterson with a pistol, he shot him one time." The evidence shows that the parties were approaching the house at the time the shot was fired, Patterson a little diagonally in front of appellant. The shot entered the lower part of deceased's back, coming out in front just a little below the navel. A day or so later deceased died. In fact, the evidence shows he died on Tuesday. Mrs. Patterson denied calling the deceased a derned fool when he left the house that morning, and said she did not use that language.

The defendant testified in his own behalf; after narrating the fact that deceased and his wife were guests of himself and wife and had been since the burning of their house, and the further fact that deceased

did not spend Saturday night with him and his wife, but did spend it with their father-in-law, Burnett. He testifies in regard to going to the house of .his father-in-law the following morning to see deceased about his conduct towards his wife. He says that night after they laid down about 9 o'clock he had a conversation with her and she related to him what occurred, and the remarks made by deceased toward her. He said: "She said that when she walked out on the gallery and told him to come to breakfast that he turned and told her to shut her God damned mouth, that he was tired of her bothering him and he wasn't going to have any more of it, he would get out of her damned old house as quick as he could." This was the first information that was conveyed to him about the conduct. He says: "When those facts were communicated to me about what Bud Patterson said to my wife I was very much grieved over it to think she was imposed on in that way. I do not believe I slept any at all that night; I don't believe I slept any before 3 or 4 o'clock. It worried me so bad I don't think I slept at all. I got up the next morning about 5 o'clock and went down to Tram about five or six hundred yards from my house. I went for the purpose of borrowing a gun, and failed to find one at the place." He subsequently did find a pistol, put. it in his bosom and returned to his residence. He then went to Burnett's residence and met deceased's son, who had just gotten up, and appellant asked him if his father was at home, and he said he was. "I went back out to the crib where I had left the gun. I never carried it in the house. I got the gun and walked right straight from the lot to Mr. Burnett's. It must have been somewhere about 6 o'clock when I got to Mr. Burnett's, the sun was about rising. My purpose in going to Mr. Burnett's was to see Bud about what he said to my wife. I will now tell the jury what I went there for and what I was going to do. I went there for the purpose of seeing him and have a reconsideration over the way he had talked to my wife. I wanted to meet him in a gentle manner. I was afraid of old man Burnett because he was larger than I was and he had three sons, two of them were larger men and the other was almost as large, and that is the reason I carried the gun with me, was in case they doubled up on me I would have protection. I says to Bud, 'Bud, · I suppose you gave my wife a jag of a cussing this morning?' He said, 'Whoever said it told a God damn lie,' and I says, 'Don't call my wife a liar.' At the time of this conversation I had called him out of Mr. Burnett's house. I went to him and asked him out of the yard and we went out sixty or seventy yards down the road from the house towards Votaw, which is a little north of east. When I told him this he had his right hand in his pocket; he jerked his hand out of his pocket and drew back as though he was going to strike me and I jumped backward to get away, and as I pulled my hand out of my pocket he spied a club to the right across the trail and he made for this club. I seen he was going to it ahead of me and I said, 'Bud, don't get that club,' and pulled the gun to keep him from getting the club, and when

I said, 'Don't get that club' he cast his eyes on me and saw the gun as I took it out of my bosom, and he stopped; he stopped I suppose a second or a second and a half and then turned towards the house; when he turned he said, 'Lethia, fetch my gun.' I called him three different times and told him to stop before I threw the gun on him. It was a make of gun I never had in my hands before and I expected it to be hard on the trigger, and the instant I touched the trigger it went off in my hand and I happened to have it on him. I heard him hollo for his gun one time. I was right behind him when he holloed for his gun, and just as he turned to go to the house he holloed for his gun. I was no closer than six feet of him. When he started back to the house I bore to his right, made one attempt to beat him to the house, he was going peart and I seen he was going to get ahead of me and I stopped and throwed the gun on him and holloed; every time I holloed at him I throw the gun down on him and the third time I threw the gun down on him I touched the trigger and the gun went off."

It was also shown there were one or more guns in the house at Mr. Burnett's. Mr. Burnett sustained defendant in his testimony as to the action of the deceased in advancing on appellant and appellant jumping or moving backward. All the evidence, as before stated, shows that up until this occurrence defendant and deceased had been on very friendly terms. So it may be safely stated from this record that the language and conduct of the deceased towards the wife of appellant was the occasion of the trouble.

Appellant insists, under this state of case, where the undisputed uncontroverted facts show that the occasion for the killing was a statutory adequate cause, and as the mind of the slayer was aroused on account of it, there could be no offense higher than manslaughter, and the court was in error in charging on murder in either degree, and the jury was not justified in finding him guilty of any offense higher than manslaughter from any standpoint. It may be laid down as an uncontroverted proposition that two things are requisite to constitute manslaughter, first, adequate cause; second, existing passion. If these coexist the homicide is manslaughter. If they do not combine or coexist, it may be murder in one of the degrees. Whether passion was present in the mind of the slayer actuating him to commit the deed, is to be found from the facts, and this being true, it may be said to be a matter for the decision of the jury under appropriate instruction. But where the cause and the passion are shown as the moving cause or reason for the homicide, the jury would not be authorized to find as a matter of fact otherwise than indicated by the testimony. In Stewart v. State, 52 Texas Crim. Rep., 273, it was held that if no other conclusion could be reached than that the insult to the wife was the cause of the killing, and that the cause created passion and the killing occurred upon the first meeting, the case is not murder. See also Gray v. State, 55 Texas Crim. Rep., 110. It is also the law that if the killing was on the first meeting after the accused was informed of the insults to his female

relative and while his mind was enraged from it and incapable of cool reflection, it is immaterial whether the meeting was casual or intended, or whether the defendant sought deceased for the purpose of slaying him. Cheatham v. State, 57 Texas Crim. Rep., 442; Allen v. State, 44 Texas Crim. Rep., 205; Nelson v. State, 48 Texas Crim. Rep., 274. There is another rule to this effect, that if the homicide be on the first meeting after the insults were known to defendant, and the evidence shows his mind is cool and capable of reflection, it may be murder. Jones v. State, 47 Texas Crim, Rep., 515; Jones v. State, 33 Texas Crim. Rep., 492; H. Gillespie v. State, 53 Texas Crim. Rep., 168; Branch's Crim. Law, sec. 509. In this section of Mr. Branch's work a great number of cases are collated sustaining the above proposition. In this case there seems to be no question from the facts that the insult to the wife occurred, and that it was the cause and only cause which led to the killing. None other is shown or sought to be shown except such insulting language used by deceased to appellant's wife. If his mind was agitated and aroused it would be manslaughter; if not so aroused, murder in the second degree would be an issue. Under the authorities above cited we are of opinion that the court did not err in submitting murder in the second degree.

While the witness Park was testifying in behalf of the State on cross-examination this occurred:

"Q. Didn't you hear them mention they had a falling out with Mathew and his wife?"

To which question the State objected as being hearsay, which objection was sustained by the court.

Defendant: "If he heard the deceased make any statement about it (speaking of the trouble at Davis' house) why he would have a right to tell what the statement was. I am seeking to elicit what he heard the deceased say after the difficulty came up at Davis' house; the deceased and his wife went to Mr. Burnett's, they had been living with the defendant. The fact is, Mr. Patterson's house was burned and they went to live with defendant; it appears and it will come out through this case while Mr. and Mrs. Patterson were living with defendant they had some words and the deceased cursed Mrs. Davis and if he heard him say something about that when they left Davis' house and went to Mr. Burnett's, if he heard him say that it would be admissible. He has already testified he heard him say he cursed my wife and we have a right to show that he heard deceased say so also, if for no other reason than bearing on the defendant's mind on manslaughter."

Court: "Yes, sir; you can't prove it by hearsay."

State: "If he heard the deceased curse him I have no objection."

Defendant: "Whether he heard him or not, but if he heard him say he was cursing we have a right to show it when it comes from the deceased's mouth itself that 'I cursed her' it is admissible."

Court: "I sustain the objection."

Defendant: "We offer to show by the witness that the deceased after

the falling out at Davis' house took his wife and went over to Mr. Burnett's and that he heard deceased relate on the day before the killing about how he had cursed the wife of defendant, to which evidence the State's attorney objected, and the objection was sustained by the court, to which ruling of the court the defendant excepts and tenders this his bill of exceptions."

While the bill is not as accurate or definite as might be, we are of opinion this testimony should have gone to the jury. If it was communicated to the defendant there could be no question of the fact of its admissibility, but if it was not communicated, still it was admissible. Proof of uncommunicated remarks of similar nature made by deceased about the female relative of defendant is admissible as tending to show the probable truth of insults that had been communicated. Hill v. State, 52 Texas Crim. Rep., 241; Fossett v. State, 41 Texas Crim. Rep., 400. These statements were made by the deceased the morning of and after he insulted and cursed the wife of appellant. There was other testimony of a similar kind offered and rejected.

. Another bill of exceptions recites that appellant proposed to prove by Burnett that he was present after deceased was shot and carried into his residence when the wife of defendant came through the house and had a conversation with the deceased. Objection was urged by the State to this because it "was after the shooting, after defendant had run off; it is something they want to show the deceased said and the deceased is now dead and can not testify." The court inquired the purpose of it, whereupon defendant stated it was to corroborate other evidence which they expected to offer and even corroborate the statement that was brought out in a different form by the State as to what Mrs. Patterson said to Mrs. Davis. "I think the record will show the State brought it out and we want to show the exact language that she used as conceded by Mrs. Patterson herself. Court: "If the State brought it out it is admissible." After reading from the testimony of Mrs. Patterson in regard to this matter the court excluded what occurred between them, and defendant reserved his bill of exceptions. Among other things brought out from Mrs. Patterson was this as shown by the bill: "Was anything said between he and your sister?" A. "Yes, sir." Q. "Did you hear it?" A. "Yes, sir." Q. "Where were you?" A. "I was standing right on the gallery by her." Q. "What did your husband say, and when did he say it?" A. "Well, when he started out at the gate she came on to the gallery; she said, 'Bud, you derned crazy fool, come back here and eat your breakfast.' He just put his hand on the gate and said, 'Gertie, go back into the house and attend to your own damn business and I will attend to mine.'" Q. "Was anything else said by your husband to her?" A. "No, sir." Defendant: "The record shows that this was brought out by the State from the witness Mrs. Patterson when she was on the stand testifying as to the language used by the deceased to Mrs. Davis which in effect provoked the difficulty. Now what we offer to do is, I want to be entirely frank

with counsel and the court—I may be wrong, sometimes I do go wrong, but I want to show that in the presence of this witness a few minutes after the shooting." The Court: "It is hearsay evidence unless it is res gestae, it is not a dying declaration. I sustain the objection." Defendant: "We except to the ruling of the court and we offer to prove by the witness Burnett that a few minutes after the shooting and after the deceased had been carried into the room and laid on the bed that Mrs. Davis, wife of the defendant, come in and went into the room where deceased was and that he was present and heard the conversation between defendant's wife and deceased, and the defendant's wife said, 'Bud, you are the cause of all this, you ought not to have cursed me.' And the deceased then said, 'I did not curse you.' Defendant's wife said, 'Yes, you did, you told me to go back in the house and attend to my own damned business and keep my God damned mouth shut.' The deceased confessed in the presence of the witness Burnett that he had used that language to defendant's wife on the morning stated, towit: The morning before the shooting. Defendant excepted to this ruling of the court and now tenders this bill of exceptions." This testimony we think was clearly admissible. It was res gestae. See Drake v. State, 29 Texas Crim. App., 265. It was also admissible as corroborative of Mrs. Davis as to insulting conduct.

Another bill recites that appellant offered to prove by the witness Moye that "on Saturday before the killing on Sunday witness walked with deceased from Votaw to the home of Mr. Burnett, and while on the trip deceased stated to witness of the trouble at defendant's house of that morning in which witness stated he, deceased, told me that they liked to have had a jamboree at the house this morning. I asked him (deceased) what was the matter. Well he said Lethia and Gertie had a little racket and he said he started off without any breakfast and Gertie came to the door and said, 'Bud, you derned fool, why don't you come back to your breakfast?' He said, 'You shut up your damned mouth and attend to your business, or I will come in there and get that man of your'n and beat the devil out of him.'" This evidence was offered for the purpose of showing that deceased did curse the wife of defendant, and ought to have been admitted as corroborative testimony. This was excluded by the court, and we think erroneously from what has been said in the previous part of this opinion.

Another bill recites that the State called to the stand C. C. Burnett and asked him the following question: "Did you make the statement to Mr. Alec Lee on the night after the burying of Mr. Patterson, in speaking about Mr. Patterson, he was a poor, innocent, inoffensive man and murdered for nothing on earth? A. I do not remember anything about that. Defendant objected to that character of questions on the ground that, if he had made such statement, it would be a conclusion of the witness, and not a fact upon which witness could be impeached, and such statement, if made by the witness could not affect the defendant, as a conclusion of the witness is not sufficient to impeach upon, but must

be upon facts or words which he is purported to have said. State's attorney said he was laying the predicate to impeach. Defendant: "Not upon a statement about an innocent man or man being murdered, he could not impeach him upon those broad statements." The Court: "It would be admissible upon the question of impeachment, could not be criminative or substantive evidence. It is immaterial testimony." This bill as presented can not be considered. It does not show that the witness testified in answer to the question. We will say that if the question should arise upon another trial the court's ruling in regard to the matter was error. This character of testimony is not admissible. We deem it unnecessary here to go into any discussion of the matter, and attention is called to it so that it may not arise upon another trial. In this connection see Drake v. State, 25 Texas Crim. App., 293; Drake v. State, 29 Texas Crim. App., 265; Saunders v. City, etc., R. R., 99 Tenn., 130; same case, 41 S. W. Rep., 1031.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*