## ROY WILSON v. THE STATE.

### No. 2447.   Decided October 15, 1913.

**1.—Murder—Manslaughter—Charge of Court.**

Where, upon a trial of murder and a conviction of murder in the second degree, the evidence did not raise the issue of manslaughter, but the court, nevertheless, instructed the jury thereon, the defendant could not complain. Following Alexander v. State, 63 Texas Crim. Rep., 112, and other cases.

**2.—Same—Rule Stated—Manslaughter.**

The statute itself defining manslaughter has two requisites to reduce voluntary homicide to manslaughter, towit: sudden passion and that that passion must arise from adequate cause, and if either of these requisites are lacking, the offense can not be manslaughter, but must be murder in one or the other degrees. Following Redman v. State, 67 Texas Crim. Rep., 374; 149 S. W. Rep., 670, and other cases.

**3.—Same—Insulting Words—Adequate Cause.**

This court has repeatedly and expressly held that to call a person a son-of-a-bitch is not adequate cause. Following Simmons v. State, 23 Texas Crim. App., 653, and other cases.

**4.—Same—Manslaughter—Charge of Court—Cooling Time.**

Where, upon trial of murder, the evidence did not raise the issue of cooling time or adequate cause, but the court, nevertheless, submitted a proper charge on manslaughter, there was no reversible error.

**5.—Same—Words and Phrases—Charge of Court.**

Where, upon trial of murder, the court, in his charge on manslaughter, used the word, "may," there was no reversible error, as the same may be interchangeably used with "shall" or "will."

**6.—Same—Self-defense—Threats—Charge of Court.**

Where, upon trial of murder, the evidence showed that there was but one difficulty between the parties, and if any threats were made, they were made in said difficulty, and not prior thereto, it was not necessary to charge on threats and self-defense separately; the court having submitted a proper charge on self-defense.

**7.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder and a conviction of murder in the second degree, the evidence sustained the conviction, there was no error.

Appeal from the District Court of Concho. Tried below before the Hon. Jno. W. Goodwin.

Appeal from a conviction of murder in the second degree; penalty, forty-nine years imprisonment in the penitentiary.

The opinion states the case.

*Stone & Wade,* for appellant.—On question of court's charge on manslaughter: Watson v. State, 50 Texas Crim. Rep., 171, 95 S. W. Rep., 115; Roquemore v. State, 59 Texas Crim. Rep., 568, 129 S. W. Rep., 1120; Akin v. State, 56 Texas Crim. Rep., 324, 119 S. W. Rep., 863; Dixon v. State, 51 Texas Crim. Rep., 555, 103 S. W. Rep., 399; Huddleston v. State, 54 Texas Crim. Rep., 93, 112 S. W. Rep., 64.

On question of court's charge on self-defense and failure to charge on threats: McMahon v. State, 81 S. W. Rep., 296; St. Clair v. State, 49 Texas Crim. Rep., 479, 92 S. W. Rep., 1095; Maclin v. State, 65 Texas Crim. Rep., 384, 144 S. W. Rep., 951.

*C. E. Lane,* Assistant Attorney-General; and *W. U. Early,* District Attorney, and *Woodward & Baker,* for the State.—On question of manslaughter; Ex parte Jones, 31 Texas Crim. Rep., 422, and cases cited in opinion.

On question of cooling time: McKinney v. State, 8 Texas Crim. App., 626; Clore v. State, 26 id., 624, and cases cited in opinion.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree and his punishment fixed at forty-nine years in the penitentiary.

For some time prior to July 20, 1912, appellant, a young man then twenty-three years old, and the deceased, Roy Stuart, a boy or young man, then twenty years old, lived in the same community and had been friends. The deceased was entirely blind in his right eye and appellant knew this. On July 20, 1912, they both went to the town of Paint Rock, in Concho County. The deceased, while there, went into a store and made some purchases. Appellant later came in the same store and met him,

when they spoke and had some incidental conversation. They at once separated. Appellant and his brother Harvey and a third party, shortly afterwards, were sitting on a bench on the outer edge of the sidewalk in front of the market. The deceased, from the north, came driving down the street of said town, going south, this street running north and south, and when he got opposite appellant some fifteen or twenty feet from him, stopped his buggy and asked appellant to come out, he wanted to see him. Appellant went to the buggy where they had some conversation and altercation. The substance and effect of this was, as stated by appellant alone, that deceased asked appellant if he had called him a son-of-a-bitch. Appellant denied he had and asked him who told him. Deceased said Lexie Ditto told him. Whereupon appellant said Ditto lied, or was a damn liar; that then deceased said to him, "You are a damn lying son-of-a-bitch," and deceased then slapped his left hand on his pocket and struck at appellant with his right. Appellant jumped back and caught at deceased's arm or shoulder. Neither struck the other; that thereupon deceased slapped his horse with his lines and started off in a rapid trot. Appellant took after deceased and ran down the street behind deceased's buggy for some distance. The deceased drove rapidly some seventy-five yards from where the altercation had first occurred, stopping in front of Barbee's store. He immediately got out of his buggy and walked briskly into Barbee's store, which is about ninety feet long, to about the middle of the store, looking for something. One of the clerks asked him what he wanted and he said an axe handle. The clerk indicated to him where the axe handles were and he thereupon at once took one and walked back out of the front of Barbee's store onto the sidewalk with it. When appellant saw he could not overtake deceased, when going away from him in his buggy, he ran on to the sidewalk on which the stores fronted and continued down it until he got in front of Ratchford's store, next to Barbee's, where he met his father. His brother Harvey, who was sitting with him when deceased first called him out to his buggy when the altercation occurred, immediately, in a hurry, followed his brother, appellant. Appellant saw deceased go into Barbee's store and testified that he saw him coming out of that store with the axe handle, when appellant, his father and brother immediately went into Ratchford's store, passed through it into the rear,—it was also ninety feet long,—without stopping until they got back of the stores, when, as one witness testified, in substance, the three halted and huddled together for a moment when the father passed something to appellant. The three then immediately continued, went into the back of Barbee's store, walked from the back to the front, the three abreast, the father in the center, appellant to his right, and the brother to his left. Another witness testified that when they reached the front door of Barbee's store he was standing in it to one side and that appellant's father told him to look out, or get out of the way, and that he immediately did so. When they got to the door, without stop-

ping, appellant walked out some eight or ten feet on the sidewalk in front of the door, the father and brother halting back nearer to the door, when appellant, facing north, made one or two steps and proceeded immediately to begin firing his six-shooter at the deceased. One of the witnesses testified that when appellant came out of Barbee's store he had a pistol in his hand. Another that he tiptoed out to where he did the shooting. A large number of witnesses, who were wholly disinterested, and not related to either party, were present on the sidewalk where the shooting occurred and saw it all. The effect of their testimony is that when deceased emerged from Barbee's store with the axe handle that he had it down at his side like a walking cane, and had some conversation with parties at the time about the rain the day before. Then walked up from in front of Barbee's to the front of Ratchford's store as if looking for someone; that he then turned and came back to a point in front of Ratchford's store, stopped, facing about east and looked at a party crossing the street; that he made no demonstration with the axe handle and said nothing and did not attempt to raise the axe handle and strike at the appellant, or anyone else, and that while thus standing, the appellant deliberately and rapidly fired his six-shooter at him three times in rapid succession, each shot of the three striking him in his right side, one just above, the other just below and the other back of the right nipple,—all three balls ranging directly from his right to his left side; that with the first shots deceased drew himself up and placed his right arm across his breast, his hand about on his left shoulder, and with the first two shots began to fall and did fall prostrate on the sidewalk with his head close to the outer edge thereof, and his feet back toward's Ratchford's store where he was standing when first shot; that after he was down, either of the three wounds being necessarily fatal, as the doctors testified and the facts proved, the appellant deliberately took aim and shot him twice again; that when he fell he turned around with his face up and his left side then toward appellant; that one of the balls, evidently the last fired, was then fired through his left arm into his left side while he was lying prostrate on the sidewalk in the last throes of death. To take the whole testimony of the many eyewitnesses, who were all disinterested, it is certain that deceased did not see appellant when he came out of Barbee's store and was not aware of his presence until he was ruthlessly and without the slightest provocation shot down by appellant. While appellant and his father and brother testified that deceased drew back the axe handle in a striking position towards appellant immediately before the shooting, every other eyewitness, and there were many of them, testified to the reverse. The distance from appellant to deceased when the shooting occurred was shown to be not less than fifteen feet by actual measurement. Some of the witnesses, by actual measurement, make it not less than from fifteen to eighteen feet. Appellant himself, on cross-examination, said: "It looked to me like his face was turned directly towards me, that was the way it looked to me, *but he might not have seen me;* I had known Roy Stuart since

about January, 1905; he was blind in his right eye, and I knew that at that time; he was standing mighty near straight facing me when that shooting began; he might have been leaning a little bit with his right side more towards me." Nearly every disinterested witness said deceased at no time had his face towards appellant but was facing, looking east, with his right side—his blind side—towards appellant.

The testimony, as a whole, without contradiction, establishes that the appellant was cool, collected and deliberate all the way through from the time the difficulty first arose in the buggy until after he had slain the deceased. In his own testimony he did not testify that he had any sudden or other passion whatever, nor did he testify that he had any anger, rage, sudden resentment, terror or other passion rendering him incapable of cool reflection. To take his whole testimony, without reciting it, it shows that he was not thus aroused, nor did he claim to be.

The court submitted manslaughter to the jury. The State contends manslaughter was not raised. In our opinion, after a most thorough and full consideration of the evidence, we are of the opinion that manslaughter was not in the case and should not have been submitted to the jury.

In McKinney v. State, 8 Texas Crim. App., 626, this court, through Presiding Judge White, said: "A killing upon such sudden passion as is mentioned may be murder in the second degree, even though the passion was anger, rage, sudden resentment, or terror, rendering the mind incapable of cool reflection. To make such killing manslaughter, there must actually have existed not only such state or emotion of the mind, but the *adequate cause* which produced them must also exist. Penal Code, art. 602 (1137). Insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury, may be sufficient to cause the emotions of the mind known as anger, rage, sudden resentment, or terror, to the extent even of rendering it incapable of cool reflection, and yet a killing under such circumstances would not be manslaughter. Why? Because such insulting words or gestures, or such assault and battery, *are not adequate causes* (Penal Code, art. 596 (1131), and manslaughter can not be predicated upon any voluntary homicide upon sudden passion not arising from an *adequate cause.* Penal Code, art. 593 (1128)."

In the recent case of Davis v. State, 70 Texas Crim. Rep., 37, 155 S W. Rep., 546, this court said: "It may be laid down as an uncontroverted proposition that two things are requisite to constitute manslaughter: First, adequate cause; second, existing passion. If these coexist, the homicide is manslaughter. If they do not combine or coexist, it may be murder in one of the degrees." Likewise, in Redman v. State, 67 Texas Crim. Rep., 374, 149 S. W. Rep., 670, this court said: "The statute itself defining manslaughter has two requisites to reduce voluntary homicide to manslaughter, towit, 'sudden passion,' and that that 'passion must arise from an adequate cause.' If either of these requisites are lacking, the offense can not be manslaughter, but must

be murder in one or the other degrees." The law is not only thus settled by the decisions of this court, but is unquestionably so settled by our manslaughter statute. Kelly v. State, 151 S. W. Rep., 304; Clore v. State, 26 Texas Crim. App., 624; Hill v. State, 11 Texas Crim. App., 456; Neyland v. State, 13 Texas Crim. App., 536; Blackwell v. State, 29 Texas Crim. App., 194; Miller v. State, 31 Texas Crim. Rep., 609; Ex parte Jones, 31 Texas Crim. Rep., 422.

While the court should not have submitted manslaughter, his having done so was favorable to appellant and he has no ground of complaint therefor. Eggleston v. State, 59 Texas Crim. Rep., 542; Alexander v. State, 63 Texas Crim. Rep., 102.

This court has repeatedly and expressly held that to call a person a son-of-a-bitch is not adequate cause. Simmons v. State, 23 Texas Crim. App., 653; Levy v. State, 28 Texas Crim. App., 203; Barbee v. State, 34 Texas Crim. Rep., 129; Timon v. State, 34 Texas Crim. Rep., 363. The statute itself states, P. C., art. 1131, what are not adequate causes: "Insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury,   .   .   .   unaccompanied by violence, are not adequate causes." At most all that deceased said or did towards appellant was, as testified to by appellant, he called him a son-of-a-bitch, or damned son-of-a-bitch, and struck at him with his hand. He committed no battery upon him whatever, and when he did this he immediately departed from appellant. So that there was neither adequate cause, nor was there any sudden passion. In no contingency was appellant, under the law, guilty of manslaughter.

Even if manslaughter had been in the case none of appellant's objections to the court's charge on that subject present any error. While the court correctly told the jury, in accordance with the manslaughter statute that the provocation must arise at the time of the commission of the offense and that the passion is not the result of a former provocation, yet, he fully and completely, as was proper, when a question of that kind arises, told the jury that in passing upon the sufficiency of the provocation and the effects of the passion on appellant's mind, the past conduct of the deceased towards the defendant, his threats and bearing,—in fact, all the facts and circumstances in the case should be considered by the jury. By no proper construction of the charge was the jury restricted in any way to the consideration of what occurred at the immediate killing and not when the difficulty first began. The whole evidence in this case demonstrates that there was but one difficulty between these parties, not two; that it began at the buggy of the deceased and was immediately and continuously followed up by both parties until, within a space of a very short period of time, the killing occurred. So that the question of cooling time was not in the case, even if the evidence, which it did not, had shown appellant's passions had been unduly aroused.

Appellant's criticism of the court's charge that in submitting manslaughter to them, after giving the necessary facts that must be found

by the jury from the evidence beyond a reasonable doubt, "then you *may* find him guilty of manslaughter," is hypercritical. The word *may* is sometimes used interchangeably with *should* or *must* and vice versa. In no event could the use of this word *may* have been any injury to appellant.

There was no reversible error, under the facts of this case, in the court's charge on self-defense as claimed by appellant on the question of threats claimed to have been made by deceased towards appellant. As stated above, there was but one difficulty between these parties, all occurring continuously and without any break or cessation from the time it began until the killing occurred. The court was not called upon to charge on that subject at all, even if what appellant testified deceased said to him, when they separated and he was following him up in his buggy, could be considered a threat. In Hancock v. State, 47 Texas Crim. Rep., 3, this court said: "The charge is further criticised because of this omission to submit the law in regard to threats. The only threats, if any, were made at the time and during the progress of the difficulty and were made in the presence of appellant and directly to him. It was not necessary to charge on the law of threats under this state of case. It was a part and parcel of the transaction itself; one of the remarks made while the first difficulty was in progress, made to appellant himself. It is only necessary to charge the law of threats when those threats have been made prior to the difficulty and communicated. Whenever the threat is made by the assaulted party to the party making the assault during the progress of the difficulty, it is not necessary to charge these separately. It will be noted there was no attempt to prove any previous trouble between them. The only trouble that had occurred at all began in the saloon, at which place this threat should have been made, if made at all. There was no threat made after leaving the saloon; nor was deceased making any attempt to execute any threat. So there was no error in this omission." Armstrong v. State, 50 Texas Crim. Rep., 26; Dobbs v. State, 54 Texas Crim. Rep., 550; Davis v. State, 52 Texas Crim. Rep., 149.

The court did not err in refusing appellant's fourth special charge. The facts of this case did not call for it and it is not the law.

Appellant's only other complaint is that the evidence is insufficient to sustain the verdict. The evidence is not only amply sufficient to sustain the verdict, but the verdict finding him guilty of murder in the second degree is a just and righteous one. The judgment is affirmed.

*Affirmed.*