JOHN LAMB v. THE STATE.

No. 3204.    Decided June 26, 1914.

Rehearing denied October 28, 1914.

**1.—Murder—Verdict by Lot—Taking Average—Rule Stated.**

If jurors take the average as a means of securing an expression as to their views in respect to the punishment (making an experiment) and with no agreement in advance to be bound by the result, or if the agreement is broken, the court's finding of no error will not be disturbed on appeal. Following Leverett v. State, 3 Texas Crim. App., 213, and other cases.

**2.—Same—Evidence—Threats of Deceased—Bill of Exceptions.**

Upon trial of murder, there was no error to permit the wife of the deceased to testify that during her husband's entire lifetime she never heard him make any threat of any kind against the defendant; besides, the bill of exceptions was defective.

**3.—Same—Evidence—Acts of Defendant—Res Gestae.**

Upon trial of murder, there was no error in admitting in evidence what was said and done by the defendant and the deceased from the time they first came in view of each other and when the killing occurred, and that the defendant immediately after leaving the scene of the killing had a six-shooter in each hand and attempted to resist arrest. Following Girtman v. State, 73 Texas Crim. Rep., 158.

**4.—Same—Evidence—Ill Will—Rebuttal.**

Where, upon trial of murder, defendant claimed acts of hostility on the part of the deceased to kill him, there was no error in permitting the State to show that the deceased had no ill-will against the defendant and that no acts of hostility, etc., existed.

**5.—Same—Manslaughter—Charge of Court.**

Where, upon trial of murder, the evidence failed to raise the issue of manslaughter, there was no error in the court's failure to charge thereon.

**6.—Same—Provoking the Difficulty—Charge of Court.**

Where, upon trial of murder, the evidence raised the issue that defendant provoked the difficulty, there was no error in submitting the same to the jury.

**7.—Same—Indictment—Misspelling.**

Where, upon trial of murder, the letter "t" at the end of the word "afore-thought" was omitted, there was no error, when the indictment was read as a whole.

**8.—Same—Verdict by Lot—Conflict of Testimony.**

Where, upon motion for new trial, the court heard testimony on the question of misconduct of the jury in arriving at a verdict by lot and was clearly

justified in holding that the verdict was not reached by lot, although the evidence was conflicting, there was no reversible error.

### 9.—Same—Manslaughter—Charge of Court.

Where, upon trial of murder, the evidence suggested self-defense, but not manslaughter, there was no error in the court's failure to charge on manslaughter.

### 10.—Same—Rule Stated—Manslaughter—Murder.

Two things are requisite to constitute manslaughter; first, adequate cause; and, second, existing passion; unless these two requisites co-exist, the offense is murder; and the passion must be caused by what the deceased does or says, and where the testimony in no way showed or tended to show that the deceased by word or act at the time of the killing said or did anything to the defendant to produce adequate cause, there was no error in the court's failure to charge on manslaughter.

### 11.—Same—Rule Stated—Adequate Cause.

It has always been held that if there is no adequate cause to produce a state of mind such as anger, rage, sudden resentment or terror, even if such state of mind does exist, the offense is not manslaughter, but murder on implied malice. Following Johnson v. State, 67 Texas Crim. Rep., 441, and other cases.

Appeal from the District Court of Tarrant. Tried below before the Hon. James W. Swayne.

Appeal from a conviction of murder; penalty, thirty years imprisonment in the penitentiary.

The opinion states the case.

*Mays & Mays* and *Lattimore, Cummings, Doyle & Bouldin,* for appellant.

*C. E. Lane,* Assistant Attorney General, for the State.

PRENDERGAST, Presiding Judge.—Appellant was convicted of murder and his punishment assessed at thirty years in the penitentiary. This is a companion case of the same appellant, recently decided, 74 Texas Crim. Rep., 301, 168 S. W. Rep., 534.

Appellant complains that a new trial should have been granted because, in effect, the jury arrived at its verdict by lot,—that is, a quotient verdict. The court heard evidence on this issue which is shown by one of appellant's bills. Mr. Branch in his Criminal Law, section 844, second subdivision, says: "If jurors take the average as a means of securing an expression as to their views in respect to the punishment (making an experiment), and with no agreement in advance to be bound by the result, or if agreement is broken, the court's finding of no error will not be disturbed on appeal. Leverett v. State, 3 Texas Crim. App., 213; Cravens v. State, 55 Texas Crim. Rep., 519, 117 S. W. Rep., 153; Goodman v. State, 49 Texas Crim. Rep., 185, 91 S. W. Rep., 153; Reyes v. State, 56 S. W. Rep., 629; Pruitt v. State, 30 Texas Crim. App., 156, 16 S. W. Rep., 773; Barton v. State, 34 Texas Crim. Rep., 613, 31 S. W. Rep., 671; Hill v. State, 43 Texas Crim. Rep., 583, 67 S. W.

Rep., 506." The trial judge was justified in holding, as he did, that the verdict in this case was not an illegal one under this line of authorities.

Appellant has several bills of exceptions to the admission of certain testimony. We will give his first on this subject in full. Omitting the number, style of the case and the court below, it is:

"Be it remembered that upon the trial of the above styled and numbered cause Mrs. John Guest, widow of deceased, was called to the stand by the State and was asked if prior to the time that defendant killed John Guest, during her husband's entire lifetime, she ever heard him make any threat of any kind or of any character whatever against John Lamb, and answered that she did not.

"To this the defendant objected as an attempt to prove the character of the deceased; because it relates to a purported statement by deceased long prior to the killing, and because defendant does not rely upon any threats as a provocation for the killing. The court overruled the objection and defendant then and there excepted, and now tenders this his bill of exception and asks that same be approved, ordered filed and made a part of the record herein; which is accordingly done.

"Approved Apr. 1st A. D. 1914. Jas. W. Swayne, Judge 17th District Court, Tarrant County, Texas."

Clearly under the rules established by the Supreme Court when it had criminal jurisdiction and by this court upon its organization in accordance with the statute this bill is so meager and insufficient as to neither require nor authorize this court to consider the question sought to be raised. James v. State, 63 Texas Crim. Rep., 75; Conger v. State, 63 Texas Crim. Rep., 312; secs. 857 and 1123, White's Ann. C. C. P.; Best v. State, 72 Texas Crim. Rep., 201, 164 S. W. Rep., 996.

However, we have considered the admissibility of the evidence attempted to be raised by all of his bills, and in our opinion, the evidence was properly admitted.

The evidence objected to by these various bills is along these lines: First, as to what was said and done by appellant and by deceased from the time they first came in view of each other at which time the killing occurred, and that the appellant when leaving the scene of the killing immediately after it, had two six-shooters, one in each hand, and when the constable attempted to arrest him for killing deceased he resisted arrest and shot the constable. All this testimony, we think, was clearly admissible as res gestae. Girtman v. State, 73 Texas Crim. Rep., 158, 164 S. W. Rep., 1008, and cases cited; Washington v. State, 19 Texas Crim. App., 521, 53 Am. Rep., 387; Wiseman v. State, 32 Texas Crim. Rep., 454, 24 S. W. Rep., 413; Koller v. State, 36 Texas Crim. Rep., 496, 38 S. W. Rep., 44; Means v. State, 10 Texas Crim. App., 16, 38 Am. Rep., 640; Cox v. State, 8 Texas Crim. App., 254, 34 Am. Rep., 746; Johnson v. State, 30 Texas Crim. App., 419, 17 S. W. Rep., 1070, 28 Am. St. Rep., 930; Tooney v. State, 8 Texas Crim. App., 452; Elmore v. State, 78 S. W. Rep., 520; Stanley v. State, 44 S. W. Rep., 519; Ency. of Ev., p. 615; Renn v. State, 143 S. W. Rep., 167.

Second. Appellant by his cross-examination of the State's witnesses—

he introduced none—attempted to show an intense hostility by deceased against him which had continued for quite a length of time. So much so as to estrange his mother and sister with whom he lived from him and they sought protection by leaving his home and going to deceased's, and that deceased, in effect, denied him access to his mother and sister; that deceased carried arms,—guns,—for the purpose of killing him and deceased seeking to kill him and have others to do so, all growing out of what he claimed was the deceased's attempt to control the property and prevent his mother from dividing hers with him and turning it over to him. We do not attempt to give the particulars of these matters, nor any of them in detail. The State undertook to meet appellant's contentions and the evidence brought out by him along this line by having various witnesses testify of their own knowledge that the deceased had no ill-will against appellant and, in effect, denying all of appellant's claimed acts of hostility and claimed intentions and plans to kill him. When he raised these questions and by his examination of the witnesses on cross-examination, introduced evidence tending to support his contentions, the State had a right to meet it by the proof it introduced to show the contrary.

Manslaughter was not in the case. There is no evidence whatever even suggesting adequate cause.

Appellant objected to the court submitting provoking a difficulty at all, and made many objections to the charge itself. From a careful study of the evidence we believe provoking a difficulty by appellant for the purpose of killing the deceased was raised by the evidence and the court correctly submitted it. None of appellant's objections to the court's charge in this respect show any reversible error.

The court did not err in overruling appellant's motion to quash the indictment. The grounds of the attack of the indictment in this case we regard as more than ordinarily hypercritical. One objection is wherein in the indictment it is alleged that appellant killed the deceased with malice "aforethought" the "t" at the end of the word was omitted. Taking the indictment as a whole, there can be no question but that the leaving off of the "t" in the spelling of said word could in no possible way have misled appellant nor be fatal to the indictment.

We have given this case careful investigation and study and in our opinion no reversible error is pointed out.

The judgment is affirmed.

*Affirmed.*

ON REHEARING.

October 28, 1914.

PRENDERGAST, Presiding Judge.—On July 6, 1914, appellant filed his motion for a rehearing upon the sole ground that this court erred in deciding that the trial judge was justified in holding that the verdict was not arrived at by lot. This motion was submitted October 7, 1914. On October 20th he filed what he terms a supplemental motion

for new trial. In that he urges the same ground as in his original motion, and in addition, that the trial court erred in not submitting manslaughter.

To sustain his contention in his original motion he copied extracts from but two of the seven jurors who testified before the trial judge as to how the verdict was reached. We quote what he there says these two jurors testified:

He says W. R. Mays swore: "After we all agreed 'guilty'; then we had several ballots; each man put down a number of years and divided by 12 for the purpose of arriving at a verdict. Every man put his number down on a piece of paper, add that up and then divided by 12. We had agreed to abide by whatever result that figured and if it had figured out 99 years, then we would have been compelled to abide by it. I abided by the result after we divided by 12 because I had already agreed to be bound by it—that was the agreement. I abided by the result after we divided by 12 because I had already agreed to be bound by it—that was the agreement."

In his supplemental motion he now quotes this in addition to what he says said juror swore: "I was for a lower term than 30 years . . . the reason I did agree to a 30-year verdict myself, was because I felt like I had agreed beforehand that I would abide by it. I would not have abided by a 30-year verdict if I had not agreed to it before, and felt myself morally bound; the only reason I returned a verdict of 30 years was because I had agreed to abide by the result when we divided by twelve."

The other juror whom he quoted in his original motion was Huffman, whom he says swore: "It was agreed before we ballotted on that, that each put down what he thought defendant ought to receive and divide by 12 and knock off the odd years either for or against and that would be our verdict and that would be the verdict of the jury."

In his supplemental motion in addition he quotes what he says the juror Ritchie swore: "It was already agreed before we divided by 12 that we would abide by the result whatever that might be, plus or less the odd years as the case might be; if it came to 32 years and 6 months, we agreed to give him the benefit of the months. I do not mind stating that I voted for 25 years the *first* and the *last time.* The reason that I came back to 30 years was,—I had agreed to abide by the result after we divided by 12; . . . if it had been 50, I would agree to it after dividing by 12 because I had already agreed to do so."

The statement of facts in his bill of exceptions on this subject is twenty-five typewritten pages. Of course, he did not undertake to copy all either of these jurors swore, nor any that the others swore. Before deciding this question in the original opinion we read and studied the whole of this evidence carefully. We have again done so. The testimony of the seven jurors is more or less contradictory. The testimony of each of them is somewhat contradictory. In other words, some of the jurors contradict themselves in their own testimony. This statement of facts in the bill does not show what was drawn out by direct,

nor what by cross-examination. It is evident, however, from reading it that part was drawn out on direct and part on cross-examination. The trial judge heard all this and the testimony of each of the seven jurors, saw their manner of testifying, the questions that were put to them on direct and cross-examination and the whole thing, and he was much more competent to arrive at the truth of the matter than this court can be from the statement of facts. He also doubtless knew each of these jurors personally and could determine the weight to be given to his testimony and his credibility. This court can not do that. There could be culled perhaps enough of the testimony of these jurors, if taken alone and believed by the judge, in favor of appellant, to have justified him in holding that the verdict was reached by lot. On the contrary, there is ample evidence and a preponderance of it which clearly justified him to hold, as he did, that the verdict was not reached by lot. Upon the whole, it was a question of fact to be decided by the trial judge from all the testimony,—not two or three of the jurors, but all seven of them.

In order to show that each of the three jurors, whom appellant has quoted in his motions, contradicted themselves, we here copy extracts from the testimony of each. W. R. Mays further testified:

"After we all agreed 'guilty' then we had several ballots and they ranged from 5 to 99 years, something like that. After we had taken several ballots and could not get together we had some sort of *conversation* in there and after that *conversation* each man put down a number of years on a piece of paper and that was divided by twelve. We put down our number of years and divided by twelve for the purpose of arriving at a verdict. After we put it down and divided it by twelve we reached some 30 odd years; that received the approval of the jurors. . . . We had agreed not to bring in any odd years, that is, unless it suited them. After we divided it up we put it to 30 years, and *then* we all agreed to be bound by the 30 years."

Said juror Huffman from whom appellant quoted, as shown above, further testified: "The way we reached the final verdict, we saw that we differed all the way from 5 to 99 years, so we all wanted to make some agreement on it and it showed all of them were honest that they did want to come to an agreement, so the foreman, Mr. Cartwright, proposed that we all vote our sentiments and then we would add it all up and divide by twelve and that would give us an average. . . ." He then further says that the result of the division was thirty-two years and six months, and they agreed to knock the odd years off and make it thirty years even, and that they all *then* agreed to thirty years. He further swore: "If that had not satisfied me I was not legally nor morally bound to abide by the verdict; *nobody agreed to be bound by it,* only that if it figured out anywhere in the bounds of reason; the idea was that if it figured out so as to suit the jury *then they would agree on it,* and if any man had said, 'I won't agree to that verdict,' I would not have told him that he had promised to do so, it would have been his own honest conviction, it would have been his privilege to have said,

'Well, that is too much,' or 'that is too little.' . . ." Further he said: "We were just getting the average to see if that was satisfactory. After we knocked off the two years and came down to 30 then the question was, 'Is this satisfactory to all the jurors?' and they all said 'Yes'; and then we all taken a rising vote and then we signed the verdict. In dividing by twelve we were trying to get at about an average, and we did make the proposition that there would be no odd years, that is, we would give nearest to the 5, and they all agreed to do that. . . . After we knocked off the odd years *I was not bound by that verdict either morally or legally* unless I had wanted to agree to it; we were just trying to arrive at a conclusion to see if we could possibly get together. . . . In accordance with our previous discussion of the manner in which we would reach our verdict, I did not feel that whenever we balloted that way and divided by 12 that I ought to be bound by the result in accordance with our previous conversation about that, nothing more than just to try to come to a conclusion, to see how we all stood, . . . I had not made any positive agreement if that had not suited me; we voted afterwards."

The other juror he quoted from was Mr. Ritchie. In addition to what he quoted, Ritchie further testified: That after they had made the division and it amounted to 32 years and some months, the juror Helmcamp made a motion to fix the term at 30 years and that motion was put and carried, every man voting for it. Then the foreman said if anyone had anything else to say, let him rise and say it. "When the motion was made, when we all agreed on that, why, he said that all in favor of it to stand up and we all rose, and if there was anyone to say anything against it, either for or against it, they had a right to say, that they was in favor of it, if they was not, stand up. *I did not have any agreement that I was going to be bound by that result, not a bit at all, was not bound at all, and no one was bound, they had a perfect right to do either way they liked,* there was no motion at all that we would be bound by anything. . . . *Neither I nor anybody else was bound by the average; each man had a right to object to it if he wanted to.* When we divided by twelve that was done in order to get the average of the twelve men, to see how we all stood jointly. *Under the conversation and agreement we all had I had a right to object to that thirty years.* You ask me if I was morally, legally or any other way bound, under my view, to abide by the agreement or average that we reached unless I wanted to, and I answer: Not unless I wanted to. You ask me: What was the general understanding when they divided by twelve and got the average as to whether or not any man had the right to object or not agree to it if he did not want to? and I answer: He had a right to kick out if he wanted to kick out, to my understanding; that was my understanding. When it averaged up 30 years I decided, that being about the average, that I would go up 5 years in order to arrive at a verdict; the way I understood, I still had the right to say, 'No, gentlemen, I won't go by my 25 years'; that is the way I under-

stood, I had the right to do that if I wanted to; but in order to arrive at a verdict I finally agreed to the 30 years. It was my understanding that when they called for the rising vote to see whether or not 30 years suited every man on the jury, I could have kept my seat and no man had a right to object; I could have done that conscientiously." This juror had all the time before been for fixing the penalty at twenty-five years.

So that it can be seen from even these three jurors, the court was clearly justified in holding that the verdict was not reached by lot. But that is not all the testimony. We cull some of the testimony from the others, which clearly supports the court's finding.

Mr. Helmcamp testified substantially as did Mr. Huffman, that after each man had put down his number of years and they added it all up and divided by twelve, it amounted to thirty-two years and some months. He says he made this motion: " 'I move that we agree to give him 30 years,' and I believe, to the best of my recollection, everybody agreed to that, I know we did for we all shook hands over it, we agreed to give him 30 years and then knock off the two years and six months. By reason of the *conversation* we had had just prior to the time we divided by twelve, *no man on the jury was morally or legally bound to stand by that result*—I do not think there was any agreement to that effect. I could not have held it against any of them by reason of any agreement they made. I was not morally or legally bound to stand by it if it did not suit me; I had made no agreement; I had not made any agreement to be bound by that result. . . . We divided by twelve to get an average of what it would be and different fellows says 'I won't agree to that,' and I made the motion we just give him 30 years and knock off the odd months and years, and we all agreed to it."

Mr. Burns testified: "We finally agreed to vote our own sentiments, what we thought the defendant ought to have; that is to say, that each man would set down what he thought the defendant ought to have. . . . And then we would divide that by twelve. . . . Before we added this up I really do not know that it was agreed by and between the jurors for us to abide by the result of the quotient as the verdict. . . . I do not think that we agreed beforehand that that would be the manner in which we would ascertain the verdict, but it was after that that was added up. . . . I do not remember that we agreed that inasmuch as we were so far divided we would do that and would all abide by the result of it—I do not know, I would not say for certain. If it had not satisfied me I would not have abided by it. I do not know of any agreement to abide by the result of adding it up and dividing by twelve, only until after it was added up." The result of this addition and division was thirty-two years and some months. This juror, Burns, further said: "Then we all agreed to give him thirty years; that was the verdict of the jury. If the 32 years and six months or any other amount had not satisfied me I would not have been bound by it and I made no such agreement."

Mr. J. C. Cartwright, the foreman of the jury, testified to substan-

tially the same as Mr. Helmcamp. Among other things, in speaking of the agreement and result of the division, he said: "Whatever it figured out, and if it did not suit a juryman he had the right to kick. You ask me: But was the agreement before you voted on it that the man should have a right to so agree beforehand that that should be your verdict when you did that? and I answer: Agreed beforehand that he should have a right if this did not suit his—was not his ideas or his views of the matter he could say so and it was not a verdict at all. You ask me if that was before we divided by twelve, and I answer: Yes, we had an agreement that after we divided it by twelve if it was not satisfactory with any juryman or juror he had a right to kick and say so and we would take other steps then and see what we could do, it was not to become a verdict at all unless it was agreeable with every juryman, was my understanding. I made the proposition, and others did, too; I made the proposition and others co-operated with me, trying to get at about the average mind of the jury, that was it, we tried to get on an average, that is the way we tried it. I did not myself feel morally or legally bound after we divided it by twelve if it had not suited me."

The other juror who testified was Lee Gibbons. He swore: "You ask me: And if I understood you to say a while ago that you agreed that you would divide it by twelve and that would be the verdict of the jury; and interrupting, I answer: Why, we was not bound. I was not bound to agree by that, if it had not suited me I would not have agreed to it. . . . I was for 50 years; I agreed to 30 years because I felt it was within the bounds of reason, not that I ought to be bound, but because it was within the bounds of reason, the verdict was in the bounds of reason, that is what I mean; if it had not been within the bounds of reason I felt under no obligation whatever and I would not have taken it. . . . When you added up the twelve numbers and divided it by twelve it was my understanding that that was to get at the average verdict of the entire number of men; that was my idea at least, and if that was in the bounds of reason in my judgment I would vote for it and if it was not I would not vote for it. . . . We were taking that vote to see what the general average was— that was my understanding, at least, and then to see whether I would be bound by it afterwards or not."

So that, taking all the testimony of all the jurors on the subject, we are of the opinion that the trial judge was not only justified in holding as he did, that the verdict was not arrived at by lot under the authorities, but that the testimony as a whole required him to so hold.

We have again carefully considered the testimony, as shown by the statement of facts on the trial of the cause and are fully satisfied that no charge on manslaughter should have been given; that the evidence does not raise any such question. Self-defense was suggested and fully submitted. Appellant did not testify. So that we can have no intimation from his testimony of any fact or circumstance that would suggest manslaughter. As held by this court in Davis v. State, 70 Texas Crim. Rep., 37, 155 S. W. Rep., 548: "It may be laid down as an uncon-

troverted proposition that two things are requisite to constitute manslaughter: First, adequate cause; second, existing passion. If these co-exist the homicide is manslaughter. If they do not combine, or co-exist, it may be murder in one of the degrees." Neither of these, without the other, is sufficient to raise manslaughter. And the passion must be caused by what deceased does or says. The statute on the subject is just as clear to this effect as can be and needs the construction of no court. The statute says (P. C., art. 1128) manslaughter is voluntary homicide committed under the immediate influence of sudden passion, arising from an adequate cause. And, defining "under the influence of sudden passion" (art. 1129) says, it means: (1) That the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation; (2) the act must be directly caused by the passion arising out of the provocation. It is not enough that the mind is merely agitated by passion arising from some other provocation, or provocation given by some other person than the party killed. And then (3) whatever the passion is it must be an emotion of the mind rendering it incapable of cool reflection.

By adequate cause (art. 1130) is meant such as would commonly produce a degree of such passion or emotion in a person of ordinary temper sufficient to render the mind incapable of cool reflection. Art. 1131 expressly states what are not adequate causes, and the next article expressly states what are.

Art. 1137 specifically says, in order to reduce a voluntary homicide to manslaughter it is necessary, not only that adequate cause existed to produce the state of mind referred to, but also that such state of mind did actually exist at the time of the homicide.

The testimony in this case in no way shows, or tends to show, that the deceased, by word or act, at the time appellant killed him, or at any other time, said or did anything to appellant to produce adequate cause. That appellant at the time, and for a long time prior thereto, was exceedingly hostile towards deceased and repeatedly threatened to kill him and intended to kill him and was unquestionably mad at him without cause, there can be no doubt from the testimony. Deceased is shown to have had no ill-will or animosity towards appellant, and for months and weeks avoided coming in contact with him, because he feared appellant would kill him if he had the slightest pretext or opportunity. On the day he did kill him, he sought in every way to avoid coming in contact with him, retreating from him when he saw him approaching, quitting his business, went out of a store, and at the invitation of a friend went up into a doctor's office in the second story of the building to avoid being killed by appellant, and sent a runner to procure an officer to prevent appellant from killing him, and after waiting some time, and doubtless concluding that the appellant had left the store wherein he had followed him, started back into it, not knowing that the appellant was therein, for the purpose of transacting his business with the merchant,—buying some article. Immediately when he appeared before the glass door through which appellant could see him but from his position

deceased could not see appellant, he started in the door and appellant immediately went to him and attempted to shoot and kill him and did shoot at him, but the deceased in attempting to protect himself and to keep from being killed by appellant, grappled with him and struggled with him for some distance until in some way he lost his foothold and fell when appellant immediately shot and killed him. All that deceased did at the time was to try to protect himself and keep appellant from shooting and killing him. McKinney v. State, 8 Texas Crim. App., 626; Johnson v. State, 74 Texas Crim. Rep., 179, 167 S. W. Rep., 733, and cases therein cited and reviewed; Wilson v. State, 71 Texas Crim. Rep., 399, 160 S. W. Rep., 83, and cases therein cited and reviewed; Kelly v. State, 68 Texas Crim. Rep., 317, 151 S. W. Rep., 304; Tread-away v. State, 65 Texas Crim. Rep., 208, 144 S. W. Rep., 655, and cases cited and reviewed; Johnson v. State, 67 Texas Crim. Rep., 441, 149 S. W. Rep., 165. In the opinions in these cases just above cited many of the older decisions of this court are cited and discussed. We deem it unnecessary to collate all those and the many others to the same effect. We said in Johnson v. State, supra: "In Treadaway v. State, 65 Texas Crim. Rep., 208, 144 S. W. Rep., 655, and Kelly v. State, 68 Texas Crim. Rep., 317, 151 S. W. Rep., 349 (supra), we have recently had occasion to review the decisions of this State on this question, and it has always been held that if there be no adequate cause to produce a state of mind such as anger, rage, sudden resentment or terror, even if such state of mind does exist, the offense is not manslaughter but murder in the second degree."

The motion is overruled.

*Overruled.*