A. MARSHBANKS v. THE STATE.

No. 4337.   Decided January 27, 1917.

**1.—Murder—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence was sufficient to sustain the conviction for that offense, under a proper charge of the court, there was no reversible error.

**2.—Same—Manslaughter—Charge of Court.**

Where, upon trial of murder, there was no evidence sufficient to raise this issue, the court did not err in not submitting that question.

**3.—Same—Manslaughter—Rule Stated.**

·It may be laid down as an uncontroverted proposition that two things are requisite to constitute manslaughter; first, adequate cause, and second, existing passion arising therefrom. If they do not combine or co-exist and render the mind incapable of cool reflection, an unlawful killing is not reduced from murder to manslaughter. Following Davis v. State, 70 Texas Crim. Rep., 37, and other cases.

**4.—Same—Self-defense—Charge of Court—Rule Stated.**

It has been uniformly held that if the case is either murder or perfect self-defense, it is not error to fail to charge on manslaughter, and where the testimony in the instant case presented those two issues alone, there was no error in the court's failure to charge on manslaughter.

**5.—Same—Evidence—Dying Declarations—Predicate.**

Where, upon trial of murder, a proper predicate is laid for the introduction in evidence of the dying declarations of deceased, and this question was, moreover, submitted by the court to the jury under a proper charge, there was no reversible error. Following Hunter v. State, 59 Texas Crim. Rep., 439, and other cases.

Appeal from the District Court of Wilbarger. Tried below before the Hon. J. A. Nabers.

Appeal from a conviction of murder; penalty, ten years imprisonment in the penitentiary.

The State's testimony showed, substantially, that defendant and deceased were negro tenants, and lived in a cabin in separate rooms; that while apparently friendly, they had had some former altercations growing out of the weighing of cotton some time before the homicide, possibly a week or so before, and that the defendant on the morning of the day of the killing had made threats to kill the deceased, but that a day before the killing both defendant and deceased, with others, had been out hunting rabbits, and appeared perfectly friendly; that on the day of the killing both deceased and defendant were in their respective

rooms at home and the following things took place in the presence of several witnesses, that defendant got a gun from a neighbor, and, with others, entered his room when deceased came around to his room and asked the defendant for a lantern which he had loaned him; that defendant went into the room and got the lantern, and in handing it to the deceased, said: "Have I mistreated you in any way?" and deceased replied, "No, I loaned you my lantern one night and now we are even," and took the lantern in his right hand and started off, having his left hand in his pocket; that deceased did not make any attempt to strike the defendant, made no threats, but was just standing there talking to the defendant, deceased saying, "Don't be cursing in front of my family," and defendant said, "Are you sore in any way? What have I done?" to which the deceased replied, "No," and started off around the west wing of the house pretty fast, his back to the defendant, when defendant came out a little piece, threw up his gun and fired, and then following deceased fired another shot, of which shots the deceased died the next morning.

The defendant's testimony was, first with reference to the quarrel between him and the deceased which grew out of the weighing of cotton, during which defendant claimed he was struck by the deceased over the head, and also with reference to threats by the deceased, all occurring some days before the homicide, and then related the facts immediately before the killing to the effect that when he reached his house with some other neighbors, all negroes, whom defendant said had been hunting rabbits with him, the deceased walked up and said to the defendant: " 'Say, old pimp, I want my lantern.' I said, 'All right,' and walked in the house and brought it out, and he said, 'If I did right, I ought to break it over your head'; I do not know how come him to speak such words; I asked him if I had mistreated him, because if I had, I was willing to apologize, and he said, 'No, a negro like you can't mistreat anybody; I don't want any talking back from you'; I said, 'All right.' He understood I had let him have my lantern for several nights and that he was taking this one back; I told him he must be drunk and he said he was not; he said any man that would go and tell the white folks what I had about the weighing would stay with his mother; with that he stepped back; I said, 'What in the world do you mean? I have not mistreated you'; he said, 'A little of you goes a long ways with me'; I said, 'All right'; he said, 'Don't you curse me in front of my family,' and I said, 'Mister, I haven't cursed in front of your family'; he said, 'Will you respect my family?' and I said, 'I would respect his family and him, too'; he said, 'You son of a bitch, I will kill you'; I told him I would go and get Mr. Orr (who was their landlord) and bring him down there, and let him settle the trouble; as I was about to climb over the fence he (deceased) put his hand here like this (indicating his waistband of his pants) and I said, 'Mr. Walker, don't you shoot me,' and he said, 'You son of a bitch, I will kill you'; I was excited and did not know what to do; I do not

know whether I hit him when I shot first or not. He was at about the far corner of the house, and said, 'Bring me my shotgun, this damned thing is no good'; that is the words I heard him speak. I started to the gap to get over the fence, and as I did so he showed up at the corner of the house and I saw about this much of the stock of the gun (indicating about a half foot or a foot), and I do not know whether he was putting a load in it or unbreaching it, but when he brought himself about like this with the gun, I shot again, and then broke and run, etc."

These are the salient facts in the case, although the testimony is quite voluminous.

*L. P. Bonner* and *John A. Storey,* for appellant.—On question of court's failure to charge on manslaughter: Mason v. State, 72 Texas · Crim. Rep., 501; Burton v. State, 77 Texas Crim. Rep., 314.

*E. B. Hendricks,* Assistant Attorney General, for the State.

PRENDERGAST, JUDGE.—Appellant was convicted of murder and his punishment assessed at ten years in the penitentiary.

We have carefully read and studied the whole of the testimony. We see no necessity of now reciting it. The testimony by the State, and as a whole, clearly raised the issue of murder, which the court submitted and the jury found him guilty of. Self-defense was his defense. His testimony raised that issue, which was fully submitted by the court to the jury in a correct charge. His testimony, if believed, would probably have made self-defense. However, that of the State disproved that the killing by appellant was in self-defense.

Appellant complains that the court erred in not submitting manslaughter. We have carefully considered all the testimony with reference to this issue and have concluded that the testimony did not raise manslaughter, and that, therefore, the court did not err in not submitting that question.

Our statutes on the subject of manslaughter are clearly and distinctly to the effect that, in order to constitute manslaughter, there must be adequate cause, and that that cause must have produced such degree of passion as to render the mind incapable of cool reflection in order to reduce an unlawful killing from murder to manslaughter. Our decisions are to the same effect.

In Davis v. State, 70 Texas Crim. Rep., 37, this court, through Judge Davidson, said: "It may be laid down as an uncontroverted proposition that two things are requisite to constitute manslaughter: First, adequate cause; second, existing passion. If these co-exist, the homicide is manslaughter. If they do not combine or co-exist, it may be murder in one of the degrees."

This court, through Presiding Judge White, in McKinney v. State, 8 Texas Crim. App., 626, said: "A killing upon such sudden passion

as is mentioned may be murder in the second degree, even though the passion was anger, rage, sudden resentment, or terror, rendering the mind incapable of cool reflection. To make such killing manslaughter, there must actually have existed not only such state or emotion of the mind, but the *adequate cause* which produced them must also exist. Penal Code, art. 1137. Insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury, may be sufficient to cause the emotions of the mind known as anger, rage, sudden resentment, or terror, to the extent even of rendering it incapable of cool reflection, and yet a killing under such circumstances would not be manslaughter. Why? Because such insulting words or gestures, or such assault and battery, *are not adequate causes* (Penal Code, art. 1131), and manslaughter can not be predicated upon any voluntary homicide upon sudden passion not arising from an *adequate cause*. Penal Code, art. 1128." Wilson v. State, 71 Texas Crim. Rep., 399; Redman v. State, 67 Texas Crim. Rep., 374; Kelly v. State, 68 Texas Crim. Rep., 317, 151 S. W. Rep., 304; Clore v. State, 26 Texas Crim. App., 624; Hill v. State, 11 Texas Crim. App., 456; Neyland v. State, 13 Texas Crim. App., 536; Blackwell v. State, 29 Texas Crim. App., 194; Miller v. State, 31 Texas Crim. Rep., 609; Ex parte Jones, 31 Texas Crim. Rep., 422. A great many other decisions to the same effect could be collated, but we deem it unnecessary.

A careful study of the testimony has convinced us that there was no adequate cause in this case, even if the testimony would justify a conclusion of any sudden passion, which is doubtful, in order to raise the issue of manslaughter and require the court to submit such an issue.

In a great many decisions this court has uniformly held that if the case is either murder or perfect self-defense, it is not error to fail to charge on manslaughter. (2 Branch's Ann. P. C., sec. 2014, where he collates a large number of decisions.) We think the testimony in this case presented those two issues alone—murder on the State's side, and perfect self-defense for the appellant according to his testimony alone.

Appellant has two bills which show that he objected to the testimony of two witnesses wherein they testified to dying declarations of the deceased. His objections along this score were that no sufficient predicate had been laid to make such declarations dying declarations; that it was not shown that he was sane, conscious of approaching death and had no hope of recovery; and that the declarations were in reply to questions propounded to him. These were his objections, not verified by the court as facts. Upon a consideration of the testimony, we think the proper predicate was laid and that the court could, without submitting the question to the jury, properly have so held, but it seems the court, instead of deciding the question himself, submitted it to the jury and in effect instructed them of all the requisites, that the State had to prove to make the testimony admissible as dying declarations and that they could not consider the said proposed testimony along

that line unless the jury believed beyond a reasonable doubt all of the said requisites had been shown by the testimony. This practice has been approved by this court. 2 Branch's Ann. P. C., sec. 1870; Taylor v. State, 38 Texas Crim. Rep., 552; Brown v. State, 54 Texas Crim. Rep., 121; Jackson v. State, 55 Texas Crim. Rep., 79; Hunter v. State, 59 Texas Crim. Rep., 439; Ward v. State, 70 Texas Crim. Rep., 393, 159 S. W. Rep., 272.

The court correctly submitted every issue raised in a proper and apt charge. There is no necessity for further discussion of any of appellant's claimed errors.

The judgment will be affirmed.

*Affirmed.*

MORROW, JUDGE, absent.